AARON B. MEAD et al.

v.

JOHN P. ALTGELD.

*Filed at Ottawa January 22, 1891.*

1. CONVEYANCE—*name of the grantee—presumption as to his identity.* Where the owner of land executes a deed therefor, in which *James* Matteson is named as one of the two grantees, the presumption will arise that there is a person of that name, and that he is the person to whom, as a tenant in common with the other grantee, the grantor intended to convey, and that by such deed the title to an undivided half of the land became vested in him.

2. This presumption is operative, and must prevail against all other persons claiming title through the same grant, or by subsequent conveyance from the same grantor, until it is shown, in some mode which is binding upon the grantee named, if there is such a person, or upon his legal representatives, if there be any such, that his name was inserted in the deed by mistake, and that the real purchaser and grantee is not *James*, but *Joseph*, Matteson.

3. PARTIES—*suit to divest title—on the ground of mistake in the name of grantee in a deed.* Before a person or his heirs can be divested of the apparent title to land by a decree, on the ground that he was named as a grantee by mistake, he, or his heirs, in case of his death, must be parties to the suit in which the decree was rendered. Unless made parties in some way known to the law, they will not be bound by the decree, for want of jurisdiction in the court to pass upon their rights.

4. VENDOR AND PURCHASER—*title should not be open to suspicion— rights of the purchaser.* Where a good title is bargained for in the purchase of land, the purchaser will be entitled to demand a title having no defects which will materially impair its marketable quality; and if the vendor is not able to make such a title, the purchaser may refuse to perform the contract of sale, and demand back the purchase money paid by him. Whether the title to land is good, is a question of law.

5. AGENCY—*agent binding himself personally.* An agent duly authorized to bind his principal by contract, may pledge instead his own personal responsibility. The presumption is that he binds his principal, but when he expressly charges himself he will be held, and in that case the word "agent," etc., to a written promise, will be regarded as merely *descriptio personarum.*

6. Mead & Coe, real estate agents, sold land for one R., taking $1000 down as the first payment, and gave the purchaser a receipt for the

money, which provided, "that in case the title proves to be not good, this $1000 will be refunded by us to Mr. A.," the purchaser, and which was signed "Mead & Coe, agents:" *Held*, that the agents thereby made themselves personally liable to the purchaser for the $1000 in case the title was not good, and this notwithstanding that R., the vendor, at the same time gave the purchaser a similar undertaking, and that the word "agents" was to be regarded merely as *descriptio personarum.*

7. ERROR WILL NOT ALWAYS REVERSE—*admission of evidence.* Where, in an action to recover back money paid on a purchase of land, there is evidence from which the court finds, as matter of law, that the title to real estate is not good or free from a material defect, the admission of the testimony of experts to prove that the title, as shown by the abstract, is not a merchantable title, is not a prejudicial error requiring a reversal as against the plaintiffs.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. A. N. WATERMAN, Judge, presiding.

Messrs. McLELLAN, CUMMINS & MOULTON, for the appellants:

An agent who has acted in good faith in a transaction upon which money has been paid to him on account of his principal, can not be held liable in a suit to recover back the money. Ewell on Agency, 419; *Shipherd* v. *Underwood,* 55 Ill. 475; *Bamford* v. *Schuttleworth,* 11 A. & E. 926; *Colvin* v. *Holbrook,* 2 Com. (N. Y.) 126; 1 Parsons on Contracts, 379; *Warder* v. *White,* 14 Bradw. 50; *King* v. *Handy,* 2 id. 212.

Whether the evidence showed the title to be not good, was a question purely of law. Opinion of counsel is inadmissible. *Murray* v. *Ellis,* 112 Pa. St. 485; *Canfield* v. *Gilbert,* 4 Esp. 221; *Alpap* v. *Watkins,* 8 T. R. 516; *Wild* v. *Foote,* 4 Taunt. 334.

A purchaser will not be compelled to accept a doubtful title. Sugden on Vendors, 389, 391, 392; Pomeroy on Specific Per. secs. 204, 205; Waterman on Specific Per. sec. 415; *Brown* v. *Cannon,* 5 Gilm. 182.

As to the effect of the judgment, see Starkie on Evidence, 316; *Witner* v. *Slater,* 2 Rawle, 359; *Lovell* v. *Arnold,* 2 Munf.

300      MEAD *et al. v.* ALTGELD.

Brief for the Appellee.    Opinion of the Court.

167; *Jackson* v. *Wood,* 3 Wend. 37; *Wimberly* v. *Hurst,* 33 Ill. 166; *Wellington* v. *Heermans,* 110 id. 564.

Messrs. BRANDT & HOFFMAN, for the appellee:

Appellants were personally liable. *Shipherd* v. *Underwood,* 55 Ill. 475; Story on Agency, sec. 269.

There was no error in receiving the evidence concerning the invalidity of the title. The purchaser was entitled to a marketable title. *Parker* v. *Porter,* 11 Bradw. 602.

When a deed is made to a person, and to one having no existence, the first will take the whole title.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

On the 25th day of March, 1886, Julia M. Ray, being the owner of lots 4, 5, 6 and 7, block 23, in Canal Trustees' addition, etc., in the city of Chicago, entered into a contract in writing with John P. Altgeld, to sell and convey said lots to him for $30,000, of which $1000 was to be paid in cash, and the residue on terms stated in the contract. Aaron B. Mead and Albert L. Coe, copartners doing business as real estate brokers, under the firm name of Mead & Coe, negotiated the sale of said lots to Altgeld as agents for Mrs. Ray. At the time said contract was entered into, Mead & Coe delivered to Altgeld an abstract of the title to said lots, and Altgeld paid to them the sum of $1000, and received from them the following instrument:

"CHICAGO, *March 29, 1886.*

"Received of John P. Altgeld one thousand dollars, first payment on contract for purchase of lots 4, 5, 6 and 7, in the Superior Court partition of the S. ½ of B. 23, in C. T. Sub. of the W. ½, W. ½, N. E. ¼, Sec. 17, 39, 14. It is understood and agreed, that in case the title proves to be not good, this one thousand dollars will be refunded by us to Mr. Altgeld.
$1000.                  MEAD & COE, Agents,
                               per Wentworth."

Altgeld submitted said abstract to his attorney, who, after giving it an examination, advised him that Mrs. Ray's title to said lots, as shown by said abstract, was not a good and marketable title, and thereupon Altgeld demanded of Mead & Coe the return of the $1000 paid, and upon their refusal to comply with such demand, this suit was brought against Mead & Coe, to recover said money back from them. The declaration is in assumpsit, and counts specially upon the instrument above set forth, and also contains the common *indebitatus assumpsit* counts, including a count for money had and received. The defendants pleaded *non assumpsit*, and a trial being had before the court, a jury being waived, the issues were found for the plaintiff and his damages assessed at $1160. For this sum and costs the court, after overruling the defendants' motion for a new trial, gave judgment for the plaintiff. On appeal to the Appellate Court said judgment was affirmed, and by a further appeal the record is now brought to this court.

Said abstract of title seems to have been returned by Altgeld to Mead & Coe, and they having failed to produce it at the trial in response to notice requiring its production, secondary evidence was given of its contents. From such evidence it appears that, as shown by said abstract, said block 23 originally belonged to the Canal Trustees, and that on the 16th day of November, 1851, said trustees executed a deed by which they conveyed said block to S. Lockwood Brown and *James* Matteson; that in 1854 said Brown brought his suit for partition, making the heirs of *Joseph* Matteson, then deceased, and the Canal Trustees, parties defendant; that in his petition said Brown alleged, in substance, that said deed from the Canal Trustees should have run to said Joseph Matteson; that he furnished the consideration and was the real purchaser, and that the deed was in fact delivered to him, but that by mistake James Matteson was named in the deed as grantee instead of Joseph Matteson; that a decree was afterward rendered finding the facts to be as alleged in said petition, and directing

the Canal Trustees to convey to the heirs of Joseph Matteson one-half of said block, and making partition of said block by assigning the north half thereof to said Brown and the south half to the heirs of Joseph Matteson; that in 1886 the Canal Trustees made a deed in pursuance of said decree, by which they conveyed the south half of said block to said heirs; that afterward, in partition proceedings between the heirs of Joseph Matteson, the lots in question in this suit were set off to Julia Matteson, who was one of said heirs, and now Mrs. Ray, in severalty. No evidence as to the title to said lots seems to have been furnished by Mead & Coe to Altgeld at the time of said purchase, nor was any offered at the trial, other than that appearing in the abstract. The question then is, whether said abstract showed, on its face, that Mrs. Ray had a good title to said lots.

The Canal Trustees, the owners of block 23, having executed a deed in which James Matteson was named as one of the grantees, a presumption arises that there was a person of that name; that he was the person to whom, as tenant in common with Brown, said grantors intended to convey said block, and that by said conveyance the title to an undivided one-half of said block became vested in him. This presumption is operative and must prevail as against all other persons claiming title through the same grant or by subsequent conveyance from the same grantors, until it is shown in some mode which is binding upon said James Matteson, if there is such a person, or upon his legal representatives, if there are such, that his name was inserted in the deed by mistake, and that the real purchaser and grantee was not James but Joseph Matteson.

The only evidence by which this presumption is sought to be rebutted and the mistake in the deed shown, is that furnished by the findings of the decree in the Brown partition suit, the substance of which seems to have been embodied in the abstract. But that was a proceeding in which Brown was

petitioner and the Canal Trustees and the heirs of Joseph Matteson only were defendants. Neither James Matteson, nor his heirs or legal representatives, were made parties to the suit. It must be held then, in conformity with rules of law which are entirely elementary, that the decree could have no force or effect, so far as the rights actually or apparently vested in them were concerned, and therefore left all the presumptions arising from the deed to James Matteson precisely as they were before that suit was instituted.

If it be suggested that there is not and never was such a person as James Matteson, and that it would therefore have been idle for Brown to name either him or his representatives as defendants to his partition suit, it may be answered that such suggestion assumes the very fact which needed to be determined upon judicial investigation, in order to free the title of Joseph Matteson and his heirs from the defect, either real or apparent, growing out of what is alleged to have been a mistake in said deed. And it was manifestly necessary that such judicial determination, in order to be of any avail, should be had in a proceeding which would be binding upon James Matteson and his representatives, if any such persons were actually in existence. The solemn declaration of said deed is, that at the time it was executed there was a James Matteson, and that it was the intention of the grantors to make the conveyance to him, and before the title of those who now claim to be the true owners can be relieved from the defect thus created, so as to be freed from all reasonable doubt on that score, James Matteson, whether a real or fictitious person, and those who have succeeded to his estate in case he is dead, must have had their day in court, and thus been subjected to the jurisdiction of a tribunal having power to adjudicate upon their rights. Undoubtedly if they had been made parties defendant to the partition suit by some proper designation, and a decree had been rendered against them by default or otherwise, finding the allegations of the petition to be true, and

providing in some proper mode for a conveyance of the title thus apparently vested in them to the heirs of Joseph Matteson, the execution of such decree would have vested a perfect title in said heirs. But as that was not done, the decree obtained was ineffectual, and left the title conveyed by said deed still apparently vested in said James Matteson or his legal representatives.

The contract of the defendants being to refund to the plaintiff the $1000 paid if the title should prove not good, we are of the opinion that the defect under consideration was sufficiently material to justify the plaintiff in refusing to perform the contract of sale and demanding back the money paid. He was entitled to a good title, which should at least be a marketable title, that is, a title having no defects which would materially impair its marketable quality. Whether the title was good, that is, free from material defects, is a question of law. That question was decided by the trial court in the negative, and our concurrence in that decision is sufficiently indicated by what we have already said. Whether it was a marketable title may perhaps to some extent involve questions of fact, but so far as it does so, the judgment of the Appellate Court in favor of the plaintiff is conclusive here.

But the defendants contend that if there is any liability to refund to the plaintiff the $1000 paid, such liability is upon Mrs. Ray and not upon them, and that she and not they should have been sued. The contract between Mrs. Ray and the plaintiff by which she agreed to sell and convey said lots to him is in writing and contains substantially the same provision in relation to refunding to the plaintiff the $1000 paid in case the title should prove not good, that is also contained in the defendants' receipt above set forth. The contention is that the two instruments should be construed together as one instrument, and that by such construction both should be held to be contracts of Mrs. Ray, the principal, and not of Mead & Coe, the agents. We are of the opinion that this contention

can not be sustained. The construction of written contracts is a matter of law for the court, and by applying to said receipt the recognized rules of construction, we are of the opinion that it amounts to a personal undertaking on the part of Mead & Coe to refund the $1000 in case the title should prove not good. This conclusion need be in no way affected by the fact that Mrs. Ray, in her contract with the plaintiff, inserted a similar stipulation. The two instruments, though executed at the same time and in relation to the same subject matter, are not necessarily one contract. It was entirely competent for Mead & Coe, if they saw fit to do so, to become personally obligated to the plaintiff to refund him his money if the title should prove defective, and whether they did so or not must depend upon the construction to be given to the instrument to which they have affixed their signatures.

"It is undoubtedly competent," says Mr. Mechem, "for an agent, although fully authorized to bind his principal, to pledge instead his own personal responsibility, if he so prefers. The presumption is that the agent intends to bind his principal, but where he expressly charges himself personally, he will be held. Such a personal undertaking is not necessarily inconsistent with his character as agent, and where he has so promised personally, the mere addition of the word 'agent,' 'trustee,' etc., to a written promise, will ordinarily be regarded as mere *descriptio personæ*." Mechem on Agency, sec. 558.

The instrument sought to be enforced in this suit is signed by Mead & Coe, and the undertaking is, "that in case the title proves to be not good, this $1000 will be refunded *by us* to Mr. Altgeld." The promise is manifestly their own personal promise, and the addition to their signature of the word "agents," must be regarded as a mere *descriptio personarum.*

It is further contended that error was committed by the trial court in permitting the plaintiff to introduce expert testimony to prove that the title, as shown by the abstract, was not a merchantable title. This objection proceeds upon the

20—136 ILL.

ground that the question whether the title as thus shown was or was not merchantable was a question of law for the court, and therefore not a proper subject for expert testimony. If it be admitted, as perhaps it should be, that the objection to this testimony was well taken, it does not follow that any prejudicial error was committed. All the evidence from which the legal conclusion arose was already before the court, and the expert testimony was merely a statement of that conclusion. It is impossible to say therefore that it had or could have had any influence upon the judgment afterward pronounced by the court.

Various other questions were raised by exceptions taken at the trial which we do not deem it necessary to notice farther than to say, that they have all been duly considered, and that none of them in our opinion are well taken. There being no material error in the record, the judgment will be affirmed.

*Judgment affirmed.*

Mr. JUSTICE WILKIN, dissenting:

I think the evidence introduced on the trial of this case proved that the abstract furnished appellee by appellants showed a good title in Mrs. Ray. But one objection to that title is urged, viz., the bill by Brown against the canal trustees and heirs of Joseph Matteson failed to make James Matteson, or his heirs or representatives, a party defendant. It is conceded that the abstract showed that the bill alleged, in substance, that Brown and Joseph Matteson purchased of the canal trustees said property, and paid them therefor; that the deed for the same was made and delivered to them, but by mistake the name *James* instead of *Joseph,* before the name "Matteson," was written therein. It was admitted on the trial that it was stated in that bill, "in almost every form of verbiage, that the name *James* was used in the deed instead of *Joseph,* by mistake." It is not contended that said bill showed that any person named James Matteson claimed title

to said premises under that or any other conveyance. Admitting the name James Matteson, written in said deed, raised the presumption that there was such a person, and that the conveyance was to him, the bill showed that as to that transaction there was, in fact, no James Matteson,—that the conveyance by said trustees was not to a person bearing that name. Therefore, the bill showed that no person named James Matteson had an interest in the property in question. A particular James Matteson could only have been properly made a party to such bill because he had, or claimed to have, some interest in the subject matter of that litigation.

Under the allegations of his bill, what James Matteson could Brown have made a defendant, so as to have removed the objection urged against this title? The position of appellee amounts to saying, that notwithstanding more than thirty years have elapsed since the decree finding the allegations of said bill to be true, there was a mistake in the use of the name *James* in the deed from said canal trustees to said Brown and Joseph Matteson, and that no James Matteson whatever took any interest in said premises, yet inasmuch as James Matteson was not made a party to such decree, some person bearing that name may still appear and assert ownership, as the grantee of said canal trustees. Had the James Matteson who once resided in Chicago been summoned as a defendant in that proceeding, and had been defaulted, there being no allegation that he claimed an interest in said property, would the decree have been more conclusive? Might not another person of that name still assert that he was the grantee named in said deed? Suppose that after the delivery and recording of the first deed, upon discovery of said mistake, a second deed had been executed by the canal trustees, correcting the error in the first, and stating that it was made for that purpose, would it have been said the title in Joseph Matteson or his heirs was still defective, because some James Matteson

was not a party to such correction, and therefore the title might be questioned by a person of that name, under the first deed? Here, the abstract showed that on a petition to a court of chancery to correct the mistake in said first deed, all parties to the transaction (or their heirs) being before the court, the grantors were ordered to make a new deed correcting the mistake, and that in obedience to such order they did make a second deed. I am unable to see why this last deed is less efficacious to perfect the title in the heirs of Joseph Matteson than it would have been if it had been voluntarily executed, as in the case above supposed.

It is doubtless *possible* that some James Matteson may yet claim title as against Mrs. Ray; but that possibility is, in my judgment, too remote to cast a reasonable suspicion upon her title. Such a claim, if asserted, would be a most groundless and fraudulent one,—to my mind no less so than if asserted under a forged deed, or by one falsely personating the grantee in a deed.

One who bargains for "a good title" can not be required to take one which is subject to suspicion. "This does not mean that the title shall be good beyond a possible peradventure,— for then he might never be satisfied,—but it must be free from reasonable doubt." (*Brown* v. *Cannon*, 5 Gilm. 182.) Tested by this reasonable and just rule, it seems to me the title presented to appellee by the abstract furnished him, was a good title.

Mr. Justice Craig, also dissenting.